## Case No. 4,619.

The FALCON.

FLYNN v. The FALCON.

[17 Betts, D. C. MS. 15.]

District Court, S. D. New York. Nov. 3, 1849.

[1] [Reported by Hon. Samuel Blatchford, District Judge, and here reprinted by permission.]

BETTS, District Judge. The libel alleges that the schooner Ellen, owned by the libellant, on the night of January 23rd, 1849, on her voyage from New York to Suffolk, Virginia, encountered the steamboat Falcon between Little Egg harbor and Absecom beach, off the Jersey shore, running towards New York. The wind was S. W. by S., and the schooner was closehauled, heading S. S. E., and was struck by the steamboat on her starboard bow, and sunk immediately, and she charges that the collision was caused by the fault and negligence of the steamer, without blame on the part of the schooner; that the schooner, at the time, was worth $3,000. The claimants, by their answer, aver their ownership of the steamer, and deny that the collision was caused by the fault or negligence of those in her charge, or that it could not have been avoided by the schooner, and aver that it was caused by the fault of the schooner, but set up no particulars as to the position and courses of the two vessels. Evidence, partly depositions and partly oral, was given on both sides. Benjamin H. Moss, master of the schooner, and Joseph Moss and William Waters, hands on board of her, supported the allegations of the libel. They testify that the collision occurred about six o'clock in the morning. The captain and Waters were on deck when they first discovered the smoke of the steamer. She was then, the captain supposes, two and a half miles off and to the windward of the schooner, and Waters noticed her about a mile off, and apparently 100 yards to windward. At six the two other men were called. Joseph Waters says when he came on deck the steamer appeared about a mile off to the

windward, steering pretty well in shore of the schooner. These three witnesses all state that the steamer, as the vessels approached, changed her course to about east, and towards them, and the collision occurred almost instantaneously, or within two or three minutes. They judge she would have gone 100 or 200 yards clear of the schooner if she had held her course. That the schooner did not change her course. She was ordered to go about by the steamer, and captain put her helm down, and ordered the men to lighten the jib sheets, and, when in the act of obeying, the steamer struck the schooner forward the fore rigging on the starboard bow. These statements were all adhered to by the witnesses throughout their direct and cross examinations. The captain of the steamer was examined orally, and the first and third mates, and one heard by deposition on the part of the claimants. The captain did not get on deck and see the vessel until they were in the act of striking. The wind was then on the starboard of the steamer, and she was heading, he thought, E. N. E., and the schooner S. E. or S. E. by E. He fixes the time to be before 6 a. m., and says, in conversation with the captain of the schooner after he was taken on board and his wounds were dressed, he asked why the schooner attempted to cross the steamer's bows, and the captain answered that he thought her farther off, and that he could get across before meeting. Samuel R. Robertson, the first mate, was on deck. He makes the courses of the two vessels the same as the above witness. He says the collision took place at half past 5 a. m. The schooner, when he first saw her, was on the wind, off the larboard bow of the steamer, and about a quarter of a mile distant. He had ordered the helm of the steamer aport, and had hailed the schooner to go about. She did not obey his order, but kept off about four points from the wind. If she had held her course, and not kept off, would have gone clear. The steamer obeyed her helm, and at the time of the collision was on the swing to the eastward, and the schooner had fallen off about five points, and she struck with her starboard bow upon the starboard bow of the steamer. He says, if she had luffed, or held her course on the wind, she would have gone clear. He supposes the collision was fifteen miles from land. It was dark at the time. John C. Hannings, 3rd mate, was at the wheel. The steamer was going about twelve knots, and heading N. N. E., the wind S. W. The man forward as a lookout sung out "A sail ahead," and first mate ordered helm aport, which order witness obeyed; then saw schooner heading S. S. E., and thinks might be a quarter of a mile off, and thinks she changed her course after he first noticed her, but his attention was otherwise occupied. Judges she fell off considerably. from the manner the two vessels struck. He thought she had be-

gun going about, and had luffed a little. If she had luffed the collision would not have happened, and there was nothing to prevent her doing it. He thinks the steamer had swung round three points. The wind was brought on the opposite tack. When they struck, he can't say how she then headed; supposes it must be as far as N. E. by E. She was on full swing round. He rang to stop the engine, but does not know that it had stopped. He heard the captain of the schooner say that he had time to go about, and called all hands to do it, but then made up his mind to cross the bows of the steamer. Henry R. Francis was stationed as a lookout on the larboard side forward, about eight feet abaft the chocks, in conversation with another man about five feet from the staysail and ten feet from the peak from the chocks forward. When he discovered the schooner she bore a point and a half on steamer's larboard bow, and he supposes a quarter of a mile off, apparently coming directly towards the steamer. Could not tell how the steamer headed. He sung out "A sail ahead," and gave her bearings, and the mate ordered the helm hard aport, and then called to the schooner to go about. Heard no reply, and the vessels were instantly together. He thought the schooner was going about. She appeared nearly in stays. He thinks she had changed her course after he first saw her. She appeared to have kept away with intent to stand across steamer's bows. Thinks she had run off four points, and, as near as he could judge, headed E. by S. at the time of the collision, and two or three points across the steamer's bow, and to the southward of her. It was his opinion the schooner would have avoided the collision by holding her course as he first saw her, or by luffing up, which she could have done. This was his second voyage.

The testimony has been more fully stated than usual, as it affords, by this direct collation of its parts, an explanation of the cause of the disaster probably more satisfactory than could be deduced from a general reasoning. Two men were stationed forward on the steamer to keep a lookout, and one of them was examined, and his account of his position and occupation does not denote that the charge was fulfilled by them with any very careful attention. They stood considerably aft of the night heads, and were in conversation together, discussing the question whether an object supposed to be seen at a distance was a light or a light-house, it is presumable, as they were looking for one. The mate and man at the helm, the only other persons on deck, were first apprised of the appearance of the schooner by the cry of "A sail ahead." She was then, as they seem all to have computed the distance, a quarter of a mile off. She was palpably very close to them, but no reliance can be placed on any estimate of yards, in the confusion of the moment and the obscurity of the atmos-

phere. The Iron Duke, 2 W. Rob. Adm. 380. Indeed, if it had been broad daylight, the most experienced seaman could not be expected to judge satisfactorily whether two objects on the water at sea were 80 or 60 yards apart. The Emily [Case No. 4,453]. The united speed of the two vessels would pass a mile in less than four minutes, and the few seconds of sailing they found themselves apart when the steamer was first aware of the schooner's position could leave but little chance for either to do anything effectually to avoid the danger. If brought together without blame being imputable to either, it would seem that neither could be reasonably chargeable with the consequences of adopting the wrong means for extricating themselves, or for not attempting anything. No court could expect entire justice of judgment or conduct on a sudden emergency of great peril, and would not, in such circumstances, visit a mistake with any penalty upon the party committing it. The Iron Duke, 2 W. Rob. Adm. 381. It is natural that the witnesses on each vessel should think the course pursued by the other a wrong one and the cause of the collision, and great circumspection is therefore always exercised in reviewing the opinions as given with respect to the movements or acts of the opposite vessel. Id.

In evidence necessarily, from the character of the cases, imbued more or less with a partisan feeling, or one full of self confidence as to the propriety of their own conduct and the errors of the other vessel, it is found, in experience, better to rely upon what the witnesses assert of their own acts on their own vessels than their judgment or opinion of the acts on board the other, or what acts the others might advantageously have performed. The Neptune [Case No. 10,120]. In the present case the witnesses on the steamer differ widely in their ideas of the movements of the schooner. One of them supposes she gave away five points, and the other that she luffed into the wind so that her sails shook, and both those movements must have occurred within the instant of time, as it were, that she was seen before striking. Those on the schooner think the collision was caused by the steamer's veering around to head about east, and so as to run directly down upon her. Instead of taking these suppositions as grounds for deciding the question of blamable conduct between the parties, it is more satisfactory to ascertain from each class of witnesses what was done at the time on their particular vessel, with their personal observation and knowledge, and from the facts so established seek a proper conclusion as to the faultiness of the one or the other, or of both. In this mode of considering the evidence, it appears to me that no improper step was taken on board the schooner. Her course in fact was not altered at all. This is expressly asserted by her crew in their testimony, and, notwithstanding the notions entertained by the three persons on board the steamer that the schooner both bore away and luffed, yet they and the captain in effect corroborate the evidence given from the schooner, for they all assert when she struck she was heading S. E. or S. E. by E., either of which courses correspond substantially with that the schooner had all the while held closehauled upon a southwest wind, and is entirely incompatible with her having borne away four or five points, or come up into the wind so as to shake her sails.

I think, then, no ground is shown for charging misconduct in the navigation of the schooner. She was entitled, as against a sailing vessel, to hold her course upon the wind, being closehauled, and on her starboard tack, and more absolutely so as against a steam vessel. It was not, therefore, her duty to take any precaution to get out of the way of the Falcon, or make preparations in expectation of a necessity to do so, there being nothing to indicate to her that the latter was ignorant of her situation. The Girolamo, 3 Hagg. Adm. 173; 2 W. Rob. Adm. 1, 23. Furthermore, I think it proved that the steamer was to the windward of the schooner as they were approaching, and the latter could accordingly have no reason to expect the former, if the two came near each other, would attempt to pass her to the leeward under her bows. Id.; The Woodrop-Sims, 2 Dod. 87. The wrong maneuver, if any, was made on the steamer, in porting her helm, as that tended to bring her more directly in the path of the schooner. The Rose, 2 W. Rob. Adm. 4. But, as before remarked, I should not regard an error of that kind, committed in the suddenness and alarm of a night encounter, as a fault on the part of the steamer, if she had been guilty of no previous negligence or misconduct. I cannot regard the occurrence as an unavoidable accident, in which each vessel would be acquitted of liability to the other for the damage. The Catherine of Dover, 2 Hagg. Adm. 154. It could clearly have been prevented by the exercise of a suitable care and caution in due time, and it does not become an inevitable accident because it could not be prevented at the moment it occurred. The Virgil, 2 W. Rob. Adm. 205. Those previous measures and precautions must be more carefully observed in navigating during the night. Id.

The case, in my opinion, then turns upon the point whether the schooner was blamable for not showing a light or giving some signal to indicate her situation, or whether the accident was owing to an imperfect and negligent lookout on board the steamer. The English admiralty denies it to be a general rule that sailing vessels shall carry or exhibit a light at sea. The Rose, 2 W. Rob. Adm. 4; The Columbine, Id. 33; The Iron Duke, Id. 382, 383. In this court it has been held expedient and proper they should do so in great darkness, or make other signals to warn ap-

proaching vessels of their situation. Thain v. The North America [Case No. 13,853]; The Bay State [Id. 1,148]. Still the general law recognized in the English court is applied here. The Neptune [supra]. And sailing vessels at sea, under ordinary circumstances, would not be regarded in fault for not carrying or exhibiting lights. This was a starlight night, and at or about day dawn, when the collision occurred; and the weight of evidence is that the schooner was to leeward, so that the advantage of the approaching daylight would be with the steamer, enabling her to see objects east of her more easily than those inland. The duty was imperative upon her to keep up a competent and attentive watch forward, and any remissness in that respect must necessarily throw on her the liability for injuries thus caused to others. The George, 2 W. Rob. Adm. 389; The Woodrop-Sims, 2 Dod. 83; The Chester, 3 Hagg. Adm. 316; The Blossom [Case No. 1,564]. The two men entrusted with the service on the steamer when the schooner was seen coming upon them were not at their proper stations or performing their duty. They were in conversation together, and their attention withdrawn wholly from the lookout. There is no fact before me authorizing a doubt that if they had been at their proper positions and giving reasonable care and attention to the lookout, they could have discovered the schooner in ample time to have enabled the steamer to avoid her. The steamer had the advantage of a full sailing breeze abeam, in addition to her engine, and was easily steered; so that, with her velocity, she could have been put out of the way of the schooner on exceedingly short notice. This was the second voyage of one of the watch, and no evidence is given of the experience or capacity of the other man. The duty of the steamer, under the circumstances, was to have given way, by going under the stern of the schooner, and not attempted to cross her bows. The Rose, 2 W. Rob. Adm. 4. And it was incumbent on her, in order to exercise the necessary precaution in sailing, to know the true situation and bearing of the schooner, and she fails proving there was any natural impossibility, from the darkness of the night, in their so doing. Neither the obscurity of the night nor the situation of the schooner interposed an impediment to her being discerned by a vigilant lookout without the aid of lights exhibited from her. The conversation of the master of the schooner after he got on board the steamer, importing that he was trying to run under the bow of the Falcon, ought to have no great weight in the case. He had been much hurt, and was just rescued from the water, and had his wounds dressed, and his opinion, as stated by the witness, was in reply to questions put him in that condition. He is understood to say he thought he was far enough off to be able to pass the steamer's bow and relinquished his first intention of luffing, and bore away for that purpose. But I do not understand it to be charged that he admitted he in any way changed the course he had been running until the instant of striking; he thought the vessels were further apart, and that he should get across the steamer's bow before meeting. The impression gathered under such circumstances from a hasty conversation should not be allowed to weigh against his deliberate testimony, confirmed by the captain of the Falcon, that to the moment of the collision the schooner was running S. S. E., or from that to S. I think that it results upon the whole evidence that due precautions have not been observed on the Falcon and with the exercise of them she might have avoided the schooner; and as the sailing vessel was closehauled on the wind, and held that course to the instant of collision, that the responsibility of not keeping out of her way is cast upon the steamer. I shall accordingly decree that the libellants recover their damages and costs to be taxed. A reference to a commissioner to ascertain the value of the schooner must be taken.